I'm Tom Crist and I represent plaintiffs in the Sheppard v. Bearden case. With me at the council table is Elvin Rosenthal, one of the attorneys for the plaintiffs in the Campion case. We are going to divide the argument between the procedure and the substance. I'll speak first on the mootness and abstention issues and then Mr. Rosenthal will talk about merits of the case. Well, speaking only for myself, I must say that I'm not sure that I get myself past the mootness issue, so I hope you'll start there and explain to me why we should get to the next layer of the case. Okay, I plan to begin there. As you know, the case challenges a budget reduction plan that expired two months ago. Even so, this case is not moot because the issues raised by that plan are of such great public importance and because they are likely to recur. Well, public importance doesn't get us there by itself, does it? We are limited by Article III to actual cases and controversies. That's true, but public importance is one factor for you to consider based upon your decision in the Armster II case. Standing alone is not enough, but in combination with a finding that there is some likelihood that the issue will recur. But counsel, even assuming, as I think we fairly can, that the budget will, the amount of money the state takes in will never be enough to provide all of the services, not only in this area, but in other areas that citizens may desire. How do we know, other than by sheer speculation, that this exact way of cutting the budget or dealing with the budget is likely to happen again? You never know that it's going to happen again because nobody, of course, can predict the future, but that's not required under your cases in order to invoke this exception to the mootness doctrine. All that you require is a likelihood of recurrence. But we also require that the issue be not only capable of repetition but evading review. Correct. And so if here, if there's another budget crisis, which probably will occur at some point, but then if the crisis is resolved through the same mechanism, which may or may not occur, that's somewhat speculative, if that does happen, wouldn't individual parties who were prevented from getting counsel at that time be able to get review of the constitutional issues in federal court or in state court? The state courts can review their constitutional claims as well. The individual defendants can get review in the state court proceedings. Following a conviction, they can appeal and, of course, argue that the denial of counsel earlier violated their rights, and they can prove prejudice on top of that. There will be that review. But for these purposes, what the doctrine requires is review in the federal courts for the claims that we are presenting here. The issue is not, and actually the evading review title is not quite accurate because the requirements of that doctrine are not that you get review at some point in some court somewhere, state system or federal. It's whether it is unlikely that if this issue represents itself, a federal court will be able to entertain the claims before they become ruled again. So the issue for you is if next spring another moratorium is imposed for four months, will we be able to run out to federal court, file this lawsuit again, and get it heard in district court and then up to you before it becomes moot again? And it's just not possible. I mean, we hustled to get to where we are here, and it is simply not possible in most cases to get a case filed and briefed and argued in district court and rush it up to you before that four-month period will expire. In fact, under your cases, you said that time less than 12 months, or as long as 12 months, isn't enough to enable litigation of the issues. So if you have some period shorter than that, you satisfy the first prong of the exception to the mootness rule for issues capable of opposition in review. So four months isn't long enough. So what the issue is going to come down to is how likely is it that this issue will reoccur? How likely is it that there will be a budget reduction plan in the future? Well, counsel, don't you have to demonstrate not only that there is likely to be a budget reduction program, but that it would be sufficiently similar to warrant our reviewing this format? In other words, if there are 50 ways to reduce the budget, and even if we take as a given that that will happen again, why would we assume that this is the way it will be done? We're not talking about the whole state budget. We're talking about the indigent defense budget. Well, I understand that, but even so, my question, there's no constitutional right to a certain level of budgeting. Correct. So why should we presume? I'm just asking you to consider the likelihood that if there is a shortfall again in the indigent defense account, they are going to respond to it in the same fashion that the district court just blessed in this case, which is if you want to save money on appointed counsel, stop appointing counsel. I don't think that there are a great multitude of options to them. Counsel, Counsel, I'd like to ask you about this new public defense service commission and the way that it's funded. Is it possible that that would prevent this from ever being under the control of the Chief Justice? No, Your Honor, it won't. The public defense services commission simply pays the bills for counsel when they're appointed. The commission cannot appoint counsel. The commission cannot conduct arraignments. If the Chief Justice decides in the future that there's a shortfall in this indigent defense account, he can once again direct all the trial courts in this state to stop appointing counsel for four months, to quit arraignments for four months, to suspend the proceedings for four months. He can direct the trial courts to impose another moratorium. The public defense services commission can't do anything about it. All they can do is say we've got fewer checks to write now. So it's really, for the purposes of this case, it's kind of a non-issue now who is paying the bills. The issue is how likely is it that this plan is going to recur? And in considering that, you need to look at the latest developments, which we've explained in the supplemental memorandum, which I hope filed just last week, which I hope the court has had an opportunity to review. But essentially, these are the latest developments. The legislature has just cobbled together a budget and snuck out of town. That budget has a provision for indigent defense services that is less than the amount provided in the last budget cycle, which, of course, proved inadequate. That budget depends upon an $800 million income tax surcharge, which will probably be put to Oregon voters in February, and is less than the income tax surcharge that those same voters turned down just eight months ago. If that income tax fails at the polls, then the legislature is going to have to come back into special session and start cutting budgets again. But one thing is certainly going to happen if that measure fails at the polls, and there will be a $15 million reduction in appropriations for indigent defense services because they have already passed that into law. Before they left town, they passed a measure that said if the income tax surcharge is defeated, if it's put to the voters and defeated, this law disappropriates funds from, among other things, the Public Defense Services Commission. They're going to lose, I think it's actually $14.5 million, but that will put them substantially below where they were last budget cycle, which, of course, proved inadequate, and they resorted to the budget reduction plan. Will that necessarily happen? I can't tell you that it will. Counsel, can you tell me what your definition is of reasonable expectation or reasonable likelihood? Your Honor, in studying your opinions, I have never seen this court define it any more precisely than likely to recur. What about the Supreme Court? I haven't seen it there either. I do know this, and we depend in large part on your decision in Armster 2, that all that this court required there was a demonstration that times are tough and we're in a period of budget austerity, and that's about it. Armster 2, you recall, came after your decision in Armster 1 when you struck down, on Seventh Amendment grounds, a moratorium on civil jury trials that was caused by a shortfall in the budget for paying jurors. After your decision, striking down that moratorium, Congress passed a supplemental appropriation and replenished the funds, so now there's money to pay jurors, and the defendants in that case came back to this court and said, please vacate your decision because it's moot, and you declined to vacate it as moot because you said three things. It's an important issue that people need resolved. The defendants haven't promised they won't do it again, and times are tough, budgets are tight, and that was sufficient to get them past the mootness argument. Counsel, is there a distinction analytically between mootness that occurs after a decision has been rendered on a lot of controversy and mootness that occurs before a decision is rendered? I don't see that there is. I mean, there is a procedure for vacating decisions, and the result of it is that you've wasted some time and effort writing it. Well, if there's a lot of controversy at the time an opinion is written, there's no Article III problem at that moment in time when the decision is actually made, and there's at least some scholarly debate about whether one can or should undo it afterwards and under what circumstances, and that strikes me as somewhat more discretionary than the question of something that is moot before the court has an opportunity to rule it in the first instance. All I can respond is that I have not seen your cases draw the distinction you're suggesting, and I would suggest as a practical matter it doesn't seem to make any difference. The net result is that you leave a decision on the book that will provide guidance to people in the future, or whether you offer one now. I mean, the net result of you deciding that this case is moot is that it gets dismissed and we all go away, and come next spring, if we've still got a budget crisis, people are not going to have the benefit of knowing whether this is a constitutionally permissible way to deal with that situation, whether it is appropriate to suspend Sixth Amendment rights to overlook due process rights when the money gets tight, and nothing will have been gained if all we do is walk away from today and have this case dismissed out. I'm well into Mr. Rosenthal's time, but if you have further questions or mootness, I don't want to... I don't. Judge Hall, do you have any further questions for Mr. Crist? Thank you. Thank you. May it please the Court, I want to be certain, as did Mr. Crist, that if there's more discussion on mootness that we can have that discussion. We do not want to walk away from this mootness issue, and I would rather deal with it than go on to the substance if that's where we have to deal. I don't have any specific questions. I'm pretty concerned about mootness, but I don't really have any questions about it. I think we're all concerned about mootness. The Armster II decision, Judge Graber, is, you know, is an after-the-fact decision. We understand that. But the language of the Armster II decision didn't approach it that way. And in Armster II, what I thought the Court was saying to the government was, this is such an important matter, suspension of the civil jury trial right, and it has not been conceded by the government that the government can't do this again, and it is darned important that we keep this. But it wasn't advisory when it was written because there was a lot of controversy at that time, and that seems to me to be whether the Court wrote in words that made that clear. That seems to be something that we have to grapple with now. I certainly agree with you in seeing that distinction. I mean, when we looked at Armster II, we wondered why did the Court go to such great lengths to even discuss the mootness argument on the government's motion in Armster II. Mr. Crist and I talked about this among ourselves, and it appeared to us when we read it that the Court was setting out a mootness standard, even though maybe it didn't need to do it. Clearly, Your Honor, you could disregard Armster II and walk away from this controversy and say Armster II is all dicta. But the logic of Armster II is quite compelling, at least it seems so to us, because the logic of Armster II is, as I see it, as Mr. Crist and I see it, is that if the government refuses to concede that it can't do something again, which the Court felt was clearly a fundamental suspension of Seventh Amendment rights. Well, that's circular in a way because that matters only if we agree with you that this exact thing is likely to happen again because people can refuse to concede all day long if it's a one-time thing. They didn't concede, and that's life. In our situation, Your Honor, the administrators of the Oregon court system, faced with a shortfall, had a choice to make. They could keep on appointing lawyers up until they ran out of money and then go to the legislature and say the cupboard's bare. We have to stop unless you give us money. Or in the understandable political process, they can say to the people of Oregon, well, we don't have enough money this time, and what we're going to do is we're going to shrink down the criminal docket to a fraction of its former size so we can limp through this fiscal biennium. The Chief Justice of Oregon, wearing his administrator's cap, had that very tough decision to make and went the way that he thought made the most sense. We go to Judge Hogan, and we say, Judge Hogan, although Justice Carson, in his administrative role, had the best of intentions, without legislative imprimatur or the people's imprimatur, he basically suspended the Constitution in Oregon for thousands of people, and Judge Hogan said it's okay. Now, let's assume that the shortfall was with the police and the cases simply didn't even get to the point of court for some period of time. Is that a violation of the Constitution in your view? If the thing that had been suspended was the investigation and prosecution end, if that got backlogged, waiting for money? I don't think so, because there is no corollary to the Sixth Amendment. Well, how is this functionally any different? Because people, assuming that a trial is delayed for the individuals for whom it is delayed, if it's delayed past the statute of limitations, they'll walk because the statute of limitations has passed. And if there is never enough money for counsel, then they'll walk because they don't have counsel. Short of that, I guess I don't see where there's a constitutional right to be tried sooner than the statute of limitations. With all due respect, Your Honor, and I mean this sincerely. I think you've misanalyzed this a little bit. These people have all been charged. They were arrested. They were charged. They were indicted or an information was filed. The statute of limitations stopped. The government got the advantage of stopping the statute of limitations because the charges were brought. And cases were simply put on suspense. For people that had been indicted or had an information before the budget reduction plan went into effect and who had trials pending in March, April, May, or June, and Judge Hogan just missed this when he wrote his opinion, those trials were simply summarily suspended for persons charged with ‑‑ And were they tried within the ‑‑ have they been tried now? We would be beyond the record. I mean, my answer is that there's just not enough judges and juries around to pick up that backlog with everything else that's going on. And I'm quite confident they've not all been tried. I assume they are coming up regularly in being given trial days. And if in any individual case there's a speedy trial violation, wouldn't that individual have redress in their individual case? But, Your Honor, isn't that a question of retrospective analysis of prejudice versus ‑‑ It's a yes or no question, actually. I think so. Would an individual have redress if his or her case was handled in such a way as to violate speedy trial rights? Yes. And my belief, Your Honor, is that most of those people will not have a speedy trial argument because the delay under the cases, as I recall reading them, is not of sufficient duration to equal speedy trial. Okay. So if they have a trial that doesn't violate the Constitution in terms of speediness, where is the violation? It's where Armster 1 said it is, Your Honor. It's in that the government, for a reason that is not legitimate, has simply suspended the rights to access to the courts. That's what Armster 1 said because there's not even a speedy trial requirement of any sort, of course, in the civil arena. But Armster 1 said under Seventh Amendment analysis it is an illegitimate governmental justification to say we don't have enough money and we're going to suspend civil jury trials. The rule must be the same for criminal jury trials. I can't see how the rule could be anything but stricter. So, Your Honor, the violation is the prospective summary suspension of the fundamental constitutional rights based upon a justification of budget when performed by an administrative person. And my time is totally up. Thank you. We'll restore three minutes for rebuttal because this is an important case, Ruthie. A lot of interesting issues, so. Ms. Metcalf. Please defer, Jan Metcalf, to the appeals. I will also begin with mootness and perhaps remain there as counsel did. I gather that the plaintiffs in this case would agree that this case is moot, but for the exception for cases that are capable of requisition, yet evading review. And they really have to show two things to satisfy that exception, both that there's a reasonable likelihood or reasonable expectation that the same events will recur and that if it does, or even in the case of now, that they will evade review. And I think neither is shown here. What's your response to the argument that regardless of whether the voters leave in place the recent tax increase, that there will inevitably be a shortfall and there are only a couple of ways to skin this cat? Well, and I think that's simply mistaken. The comparison that the plaintiffs are making, while literally accurate, is somewhat confusing or deceptive. The original budget for 0103 was something like $163 million, and I may have this figure slightly wrong. The current allocation is $161 million. It's only slightly less. What proved to be inadequate in the last biennium was that original $163 million minus approximately $22.5 million that was chopped off in the succession of special sessions that occurred late in the biennium. So certainly the current allocation is roughly $20 million above that, and there's also the possibility of an additional $7 million that the emergency board may or may not give, but that possibility is there. So we have roughly the same amount starting out in this biennium as in the last biennium, and considerably more than ended up being the bottom line figure at the end of the last biennium. So I think that's simply untrue, and I think, therefore, really the comparison that has to be made is between what will happen if the measure is, if the tax increase is referred to the voters and if the voters defeat it. And to respond, in a sense, to a question that Judge Hall asked proposing counsel of what the test is for reasonable expectation or reasonable likelihood, I would agree that I can't cite any precise definition, but certainly the case law seems to suggest that things which are really purely speculative or hypothetical are not sufficient to establish that reasonable likelihood or expectation. And I think that that, in a sense, is one of the failings here, is that there is the succession of if A, if B, if C, if D, and every step along that chain is hypothetical and conjectural at this point. What is your specific response to opposing counsel's argument that there really are not 50 ways, this is about the only way to deal with the problem if it does recur, assuming that there is a shortfall, that there really isn't any other realistic way that one could go about this? Well, I disagree, and that's actually a point I wanted to emphasize, because I think one of the things that forced the solution that was reached in the last biennium is that these really severe budget cuts occurred in a really compressed time period, essentially in the last four months of a two-year biennium, and ended up amounting to like a 30% budget cut during that period. So even if one were to assume that the voters in February of the next year, relatively early in the biennium, were to say no to the tax increase, that increased period of time in which to deal with the problem would, I think, allow both the legislature and potentially the indigent defense system to decide how to absorb or respond to any cuts that might occur. That was part of the problem here, is that there was so little time. There was an extremely serious cut that had to be both absorbed and solved within a very short period of time. What would be different over a longer period of time? What other solutions? I know we're all speculating, but just for the purpose of thinking through the problem, what kinds of other solutions might there be? I think there are a number of ones. It's possible that there might be some other way to raise money. Setting that aside, because that may be less likely, there might be ways in which the criminal justice system as a whole could get together and work out something. Perhaps prosecutors would be willing to defer indictment on certain kinds of cases or to be more selective about which cases they indicted on. Here, that was part of the problem. Indictments had already been filed when this crisis occurred and you had to deal with it then. Perhaps indigent defense providers and the judiciary could agree on some adjustment and payments that would allow things to proceed differently. I think increasing the amount of time would simply allow the system as a whole to get together and say, we have this problem, what's the best solution we can come up with? Whereas here, there was so little time that I think it's, in essence, not to say that the Chief Justice made a rash decision or didn't think about it, but there was not that time to get together all the components of the criminal justice system and to talk it over in a coordinated kind of fashion and reach some other solution. Also, simply because there would be more time, there might be more minor adjustments which would allow one to absorb that shortfall in a less severe fashion than having to absorb what essentially was a 30 percent budget cut in that four-month period. What is your response to the arguments made regarding Armstrong both 1 and 2? I think, to maybe take this backwards and start with Armstrong 2, I think some of the questions that you've asked may highlight at least one difference there, which is the fact that when the Armstrong 1 decision had been written, there was a live controversy, and it then became a matter of this court perhaps exercising its discretion to scratch from the books an opinion that had already been rendered. But is that really discretionary under our precedent? I thought, and I may not agree with this, but I thought there was some Ninth Circuit precedent that would say that the judicial power has to extend through the end of the case up through the time the mandate issues. There is such case law. It's less clear to me whether that also means extending to the point at which someone would be asking a court to reconsider and to get rid of an opinion already rendered. It certainly comes up. I'm familiar with it coming up in more than one case. And I would agree with counsel that I don't think that there's a clear answer in this court's case law to whether that bit of timing really makes a pivotal difference. But the other, I think, really pivotal distinction here is that the Armster Court seemed convinced that it was quite likely that the financial crisis would recur and that the solution would be the same. I think that court saw a much greater likelihood of reoccurrence than certainly I see as present here. What do you base your view that it's not likely that this type of a solution would be adopted? Really, I think two pivotal things. One is I think, and maybe I'm a bit overly optimistic, but I think it's both certainly not so clear that the economy will go through the dive that it did in the last biennium, particularly in the last part of the last biennium. For the first time in many quarters, Oregon has had a financial report which at least said we're holding steady. Things may not be getting dramatically better, but for quarter after quarter for a while there, it had always been they're getting worse and worse and worse. Let's assume the same budgetary tension arises. Well, and then again, I think two things. One is I think it's highly unlikely that it would occur in that same compressed fashion, and I do think that the greater length of time allows for more creativity in problem solving. It allows solutions which are simply less drastic because you don't have to absorb such a huge budget cut in such a small amount of time. There is also the fact that, and I would disagree with counsel here, that someone else would be making the decision, which, and again, not certainly to criticize anything the chief justice did, but it might mean that someone else would come up with a different solution. It simply throws another bit of uncertainty and conjecture into the mix, which I think already contains numerous items that are hypothetical. Was Judge Hogan's opinion published? Excuse me? Was Judge Hogan's opinion published? No, I don't believe it was. But would it have, if we were to decide that the controversy is moot, does that mean that his opinion is no longer precedent for any purpose? I think it does, and I think that's the approach that this court has maybe not uniformly but generally taken when a case has become moot after a district court has rendered a decision. I think in some cases this court has effectively remanded to the district court with instructions to dismiss the case, therefore, in effect, getting rid of the district court's opinion. And I certainly, personally, I think would be quite hesitant to rely on Judge Hogan's opinion. For direct precedent, there might be some analytical point worth referring to. Well, that takes me back to my question about Armster 1. Why isn't Mr. Rosenthal's argument correct on the merits if we were to reach the merits? And, again, I think there's at least one. Armster 1 is a troubling opinion, admittedly, from my side of the case. But there's at least one, I think, really pivotal distinction, and maybe two, actually, that I see in the situation here and in Armster 1. One is that as I read the Armster 1 decision, the court seemed very suspicious, at least, about the legitimacy of the budget crisis that the federal courts had faced. There are comparisons in the Armster 1 opinion, for example, to how much it cost to run a civil jury system versus how much it cost, I think it was the space shuttle, something in the space program. There's a really noted sense of suspicion. Whereas here, I don't understand anyone to be questioning that the state of Oregon faced a very serious budget crisis in the last part of this last biennium. The other difference, and this I don't think I could point to anything in the Armster decision that says this, but I think it's a somewhat, and this may involve the fact that this case involves both issues of mootness and younger kind of issues, but I think that there is a difference in a federal court addressing the legitimacy of actions taken to modify the civil jury system in federal court versus a federal court looking at how a state and the state judiciary has chosen to respond to a budget crisis impacting the state of Oregon. Well, I would not agree with that if the state chooses to respond in a way that violates the federal constitution. So that sort of begs the question, really. If the state has a budget crisis and it responds at the expense of depriving indigent accused of something that they have a right to have, then I don't think it's an answer for us that, well, this is a state process. And you're probably right. That point probably goes more to Armster II kind of issues of mootness or the younger issues. I certainly wouldn't disagree. And do you agree that the Make case also gives you some difficulties in this regard, legitimizing a decision based on money? Yes. If one assumes that we get past mootness, that we get past younger, and the issue simply becomes, and we accept as a given that the state procedures here actually do result in violations of federal constitutional rights that can't be adequately addressed in state court, then it certainly is no answer to say it's just fine that we're doing that because we don't have enough money. And I don't think that's our argument. And if our argument is understood that way, I would not have intended to couch it that way. To turn to the second aspect of mootness we've really been talking about, capable of repetition so far, and let me turn to evading review for a moment. I think the plaintiffs are also really in trouble there because these issues can be and undoubtedly are being and will be raised in state criminal proceedings where they can be addressed adequately in state court and ultimately if convictions are obtained and there's no adequate redress in state court, ultimately in federal habeas of cases get to that point. Well, that works for individual defendants, but there's also an institutional plaintiff, which assuming that it has standing in its own interest to protect in this, how would that redress the grievance of the public defender as an institution? Well, I think here it would, and there might be cases where it wouldn't, but here I think the institutional plaintiffs, as the district court said, their claims are solely derivative. That is to say their complaint is not aimed at the plan qua plan. Their complaint really is this plan is invalid and results in the deprivation of constitutional rights because of its effect in any particular criminal case, whether that be thousands of criminal cases or the cases of the four individual plaintiffs. Well, what would be true it seems to me of, I could be missing something here. I haven't decided my position on this. It seems like that's sort of true of a defender organization that its claims are derivative of the rights of the accused, but I'm not sure that's true of a prosecutor that says this is a screwball decision and I oppose it as well. Don't we have a prosecutor's plaintiff? Yes, we do. How can we view the prosecutor's interest as derivative of the accused's interests? Well, actually I think in some instances the prosecutors have asserted that, but I personally don't find persuasive, so I'll set it aside. I'm not taking a position, I'm just asking a question. But the interest that they do perhaps more plausibly assert they represent is that of victims. And there again, if it's their position that, in fact, some victim's right has been contravened by the effective Chief Justice of the Court, they can assert that as well in a criminal case. So the victims have a delay in closure of their case or something? Right, yes. How would that help? Let's assume that there's a case in which the defendant's constitutional rights are sufficiently implicated that the charges must be dismissed with prejudice against that defendant. How would a victim's rights or derivative of the prosecutor's rights be vindicated in such a situation? Well, again, I think the prosecutor would be able to assert, as a defense perhaps against the defendant's motion, the fact that the victim's rights were not being respected. So where's that going to get them if there's, for example, a speedy trial violation? Well, I think it's unlikely that there would be speedy trial violations. But they might be able to say, for example, don't hold this delay against the state. And there's been some debate certainly in state court about how one deals with delays caused by courts. But they might well be able to say don't hold this delay against the state as prosecutor because it was not delay over which we had any control. In fact, we were kicking and screaming and fighting the entire way and trying to get these things moved ahead and were unable to do so because of the position the judiciary took. Would they be able to succeed in that argument? I don't know. But I don't think that's the inquiry properly. The inquiry is not can any particular litigant prevail. It's their ability fairly to litigate the issue in state court, not necessarily prevail. There's no guarantee of one's right to prevail on an issue. Well, if we were to conclude that the underlying plan, the challenge to the underlying plan has moved, then would anything we said that intimated that the decision made about how to deal with the budget crisis was improper, just be a dictum that itself was improper? Yes, I think so. This court has said that when cases are moved effectively at that point, the court lacks jurisdiction. I think it would almost be beyond dictum or below dictum or whatever the proper comparison would be. I think it would be a discussion really of no moment, which isn't to say, of course, that the state would blithely ignore it. But as a technical matter, I think it would be of no moment. You don't think we really have the – if we think it's moved, we don't have the power to write a little essay disapproving of the practice. No. But we do have the power to render Judge Hogan's decision a nullity, right? Yes. Yes, I would agree with that. In fact, I think that would be the appropriate disposition if the court were to agree that the case is now moved. And with that and with my time rapidly expiring, unless the court has additional questions that I could attempt to answer, I believe that's all I have. Judge Hall, do you have anything? No, thank you. Thank you. Thank you. And you may have three minutes for rebuttal. Your Honor, three points are in mootness, and hopefully I'll get to one on the merits first. There's no other way to skin the cat. This is a fund that is used to pay attorney fees. The only way you can save money on that fund is not to hire attorneys. And why wouldn't they do that again? Because they've got Judge Hogan's decision saying it's okay, which brings me to my second point, which is this. Couldn't they also – and we'll give you a little more time to answer my question. Couldn't they just prosecute less people? They could. They could do this, and this is what they should have done. Don't charge people with crimes. Well, they could have done that, and maybe they'll do that the next time. Well, they didn't have, evidently, the political will to do that. But I'll get to the merits point here, which is this. It is clear as can be that you have a constitutional right to a court-appointed attorney as soon as charges are laid. There's no dispute about that. The violation of the Sixth Amendment here is clear. What they're banking on is that it only went on for four months. You can't do anything about it. And we can't. If they do another four-month violation, and again, why wouldn't they if it worked before? We can't get to you quick enough to get a ruling telling them that you can't do that. If it happened again, you'd have a little better case on the anti-mutiny argument. I don't mean to make light of it, but it's a very difficult problem for us. We're not allowed to. We can't expand our jurisdiction. We don't like a practice if it is truly moot. But you do have an exception to mootness, as in Armster 2. And what I'd like to point out is that what I'm offering you here is much more than you had in Armster 2. The court in that case required less precision in predicting a recurrence due to future budget shortfalls than what we're offering you here. The court there only required just vague references to these are tight times with the budget. We've given you that more here. We've laid out the numbers in the supplemental memorandum. There's less money in the budget now. There are more cases now because the four months' worth of cases from the last budget have been carried over. So the caseload is bigger, but this budget, as the record shows, assumes no increase in the caseload, which is ridiculous because we just added four months' worth of cases into it. There is a law passed that will cut that appropriation by $14 million. That's the law passed by the legislature. The whole thing depends upon a tax. It's probably going to go down in the claims next February. We've given you more than you demanded in Armster 2 when you decided there that a moot case was still justifiable. The time is up. Thank you, counsel. If there are no further questions, the case just argued is submitted. I'd like to thank all counsel for very helpful and well-presented arguments, and we will stand adjourned for this afternoon. All rise.
judges: Hall, Graber, Gould